UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ANTONIO BONHEUR<br><br>Defendant | Criminal No. 26-10059-IT |

**MEMORANDUM IN SUPPORT OF SENTENCING RECOMMENDATION**

The government submits this memorandum in support of its recommendation for **30 months of incarceration** for the Defendant, followed by three years of supervised release. This recommendation reflects the seriousness of the offense, the profound need for deterrence and punishment, and is sufficient but not greater than necessary to accomplish the goals of sentencing. This recommendation reflects a sentence that accords with the sentencing factors under Section 3553(a) and properly accounts for the nature and timing of this resolution and the Defendant's personal circumstances, which the government has factored into this number.

**THE ADVISORY SENTENCING GUIDELINES**

The government, consistent with the Plea Agreement (ECF #25), agrees with the offense level calculation provided by U.S. Probation, which calculated the offense level in the final Presentence Report to be 20 (PSR ¶¶95-106).

With an undisputed criminal history score of zero, the criminal history category is I (PSR ¶¶110-111). Therefore, the guideline sentencing range ("GSR") calculated by Probation is 33-41 months (PSR ¶¶131-132). The Plea Agreement entered into by the parties under Fed. R. Crim. P. 11(c)(1)(B) calls for the government to recommend a sentence not greater than the low-end of the guidelines sentencing range (ECF #25).

## ARGUMENT

The Court must consider the factors set forth in 18 U.S.C. § 3553(a) in determining a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in § 3553(a)(2). Among those factors are the "nature and circumstances of the offense," promoting respect for the law, and providing just punishment. See 18 U.S.C. § 3553(a)(2)(A). The sentence must also afford "adequate deterrence" for both the defendant and others. See 18 U.S.C. § 3553(a)(2)(B) (the court may impose a sentence "to afford adequate deterrence to criminal conduct"). Lastly, the sentence must protect the public from the further crimes of the Defendant. See 18 U.S.C. § 3553(a)(2)(C) ("protect the public from further crimes of the defendant"). Consideration of the § 3553(a) factors demonstrates that the jointly recommended sentence of 30 months is sufficient, but not greater than necessary, to meet all the statutory goals of sentencing.

The Defendant turned a 150-square-foot closet into a multi-million-dollar fraud clearing house. Over a three-year period, JVS routinely redeemed between $100,000 and $500,000 per month in Supplemental Nutrition Assistance Program (SNAP) benefits. To put this in perspective: A 150-square-foot premises with bare shelves, lacking shopping carts, lines, or significant food inventory, was out-redeeming full-service, multi-lane supermarkets across Boston, which average approximately $82,000 in monthly SNAP volume. This was not a passive economic crime conducted underneath the activity of an actual functional business. Exploiting a critical federal safety net was the only activity taking place in JVS. A sentence of 30 months of imprisonment is necessary to reflect the severe harm inflicted on public programs, punish the defendant's brazen opportunistic conduct, and send an unyielding message of general deterrence to other retailers.

**A.     Nature and Circumstances of the Offenses**

### *The SNAP Program and its Source of Funding*

The Supplemental Nutrition Assistance Program ("SNAP") is a lifeline for hardworking Americans trying to make ends meet. SNAP stands as a powerful testament to the collective empathy, productivity, and civic conscience of the American taxpayer. Funded through the hard work of everyday citizens, the program embodies a social compact: that in a nation of unmatched abundance, no individual or child should be left to suffer the indignities of hunger.

By converting billions of taxpayer dollars into a reliable baseline of food security for millions of vulnerable families, Americans demonstrate a shared commitment to human dignity and the common good. Far from being a mere line-item transfer, SNAP reflects the extraordinary generosity of American society that is willing to invest its own hard-earned resources into stabilizing communities, supporting the domestic agricultural supply chain, and providing a critical lifeline that lifts families out of poverty and fuels the nation's collective health and potential.  In many ways, the SNAP program exemplifies the greatness and charitable spirit of the American people: offering assistance to American citizens and non-citizen lawful residents who need it. However, the greatest of intentions can easily fall victim to the subtle and pernicious scams and frauds.

Federal benefit programs such as SNAP rely heavily on the honesty of private commercial partners. When the government issues these benefits, it trusts that private retailers will act as faithful stewards of public funds, verifying transactions and ensuring that taxpayer dollars are exchanged exclusively for food. In the process of making the SNAP program accessible to many, it has become susceptible to the crimes of the few. And those criminals who would steal funds designed for the poor – and do so at a scale in millions – must be rewarded with prison. This reliance on good faith is precisely why benefit trafficking is so damaging; it does not merely steal

money from the public treasury, but actively poisons the trust that the system relies upon and the faith that the American taxpayer places in the program. Every time an authorized retailer abuses that trust to steal, it degrades public confidence and depletes the public treasury.

### *The Loss Amount*

This case involves roughly seven million dollars being stolen from the SNAP program. While this Court and economic fraud cases often tally the losses into multiple of millions, it is important to put even one million dollars in terms that reflect the true victim – the American taxpayer.  The median weekly earnings of the nation's 121.5 million full-time wage and salary workers were $1,204 in 2025, or about $62,000.[1] This $62,000 equates to earning about $30 per hour, if working 40 hours per week with no weeks off and before accounting for ever growing local, state and federal taxes and other withholdings. At that rate, it would take an average American taxpayer making $30 per hour about 16 years to earn $1,000,000 dollars before taxes. In only two years, the Defendant facilitated the theft of about seven times that amount from the American taxpayer. *See* PSR ¶41 (January 2024 through December 2025).

A loss of nearly seven million dollars is staggering by any metric, but it is particularly egregious in this context. This figure exponentially exceeds the combined lifetime earnings of the vast majority of American taxpayers. To put it in perspective, an average wage earner making $30 per hour would have to work uninterrupted for about 112 years, without a single week off and, ironically, without a penny withheld for taxes, just to approach this amount. When contrasted with the reality of honest labor, an overly lenient sentence would signal that the law would protect the multi-million-dollar fruits of federal theft far more than the decades of honest work required to

---

[1] *See* Bureau of Labor Statistics, U.S. Department of Labor, *The Economics Daily*, Median weekly earnings were $1,204 in 2025 at https://www.bls.gov/opub/ted/2026/median-weekly-earnings-were-1204-in-2025.htm (visited *July 04, 2026*).

earn such an amount legitimately.

Even more troubling is that in order to generate $7 million in net tax revenue, the federal government must tax tens of millions of dollars in gross economic output of hardworking American taxpayers. Consequently, every single dollar stolen through the Defendant's crimes represents an exponential volume of hard work and productivity sacrificed by law-abiding citizens and residents. Because these depleted funds must ultimately be replaced by further taxation on honest income, the true economic impact of the Defendant's crimes extends far beyond the loss amount. In that way, the Court must also account for the profound opportunity cost of this crime: the societal benefits, public infrastructure, and other outlays that the American taxpayer could have experienced had the millions not been stolen by the Defendant.

To be sure, the Defendant did not personally pocket the entire $7 million diverted through his scheme. Rather, his retained cut was approximately 20%, which amounts to around $1,000,000 in just over two years. Even at this discounted rate, the Defendant's crimes were extraordinarily lucrative, yielding an annual income that dwarfs that of the average law-abiding taxpayer. Furthermore, there was no physical exertion required to steal this fortune.  Quite the contrary: he merely drove to the bank and withdrew massive amount of cash; swiped EBT cards through the terminal; and handed out thousands of dollars every day to SNAP recipients who apparently did not need the tax-free food offered by the program. With each swipe, the Defendant automatically made his cut.  This was a low-effort, high-reward plunder of a federal program.

The government has only recovered about $400,000 of the nearly $1,000,000 that the government believes would have been the Defendant's cut from the thefts. Consequently, the Defendant seemingly also diverted the remaining funds and the government's aggressive pursuit of the stolen funds and reduced outstanding restitution figure does not diminish the necessity of a

prison term in this instance.  This scale of theft from the American taxpayer, coupled with massive personal profit must be met with a multiple-year prison term.

### *Jesula Variety Store*

To call Jesula Variety a convenience store is rather misleading. This was a glorified closet with an EBT terminal in about 150 square feet.  Jesula has one register, no carriages, no hand baskets, no freezers, no refrigerators, and only a few items of food for sale. There was, however, space for alcohol to be sold (with no liquor license) and emergency food packs illicitly diverted from disaster zones. In short, this storefront basically existed for the singular purpose of facilitating wholesale SNAP fraud.

When the defendant's scheme accelerated in January 2024, monthly SNAP redemptions routinely cleared $200,000, driven by hundreds of beneficiaries trafficking their SNAP benefits for cash.  This sales volume far exceeded actual supermarkets, and it was entirely fraudulent.  Data logs showed multiple high-value transactions occurring within seconds of one another. In a legitimate grocery store, a $95 transaction requires time to select items, place them on a belt, scan bar codes, and bag the goods. At JVS, dozens of sequential transactions exceeding $95 were processed back-to-back each day, revealing that the only thing moving across the counter was diverted cash.  Indeed, the Defendant's actual profit margin from the stolen funds was exceptionally high because he faced none of the overhead expenses of a legitimate commercial enterprise. He had no inventory to buy, negligible operating costs, and virtually no payroll.

It is critical to note that the American taxpayer was not merely victimized by the millions of dollars directly taken out of the program. The crime is compounded because during the exact same period that the Defendant was siphoning millions of dollars through JVS's EBT terminal and padding his own pockets with hundreds of thousands of dollars in cash, he was simultaneously

capitalizing on the very safety net he was destroying. The American taxpayer was actively subsidizing the Defendant's own fraudulently obtained SNAP card. Clutching a taxpayer-funded benefit card in one hand while using the other to systematically steal millions of dollars from that program—reveals a complete and utter contempt for the public trust.

The Defendant blatantly lied under oath in order to obtain his own SNAP card. In his applications, he falsely claimed to have zero income, no assets, and rent obligations that exceeded his nonexistent earnings. There was essentially no investigation of his eligibility, beyond the Defendant's own "self-verification" that led to him being enrolled by the Massachusetts Department of Transitional Assistance in the program.

For over three years, in circumstances that expose the structural vulnerabilities of the SNAP program, the Defendant illegally trafficked his own fraudulently obtained SNAP benefits for cash at his own store that contained basically no food and was itself facilitating the theft of millions. The administrative disjointedness of this reality is remarkable. While the federal government was transferring millions of dollars to accounts designated by the Defendant for Jesula Variety Store, and while the Defendant was amassing hundreds of thousands of dollars across various personal bank accounts, the Massachusetts Department of Transitional Assistance (DTA) kept him on the state SNAP rolls as an impoverished beneficiary. Based on a single, fraudulent "self-verification" in 2022, the Defendant was able to pocket roughly $300 per month in public assistance, which he then immediately swiped for cash at his own terminal. Put another way: the Defendant was not only the president of a business committing millions of dollars of SNAP fraud, he was also a client.

In fashioning an appropriate sentence, the nature and sheer magnitude of this financial crime are critical considerations. This Court is not sentencing the defendant to years of legitimate labor or even baseline tax compliance — an inevitability faced by every gainfully employed

American — let alone the 20 years of continuous, taxed work required to honestly earn the $1.4 million he personally profited from this scheme. Rather, the government is asking the Court to sentence the defendant to 30 months of imprisonment. This recommendation represents a measured, downward variance from the advisory Guidelines, designed to ensure that the gravity of the Defendant's conduct is met with a meaningful, custodial punishment. A 30-month sentence is proper and just and reflects but a tiny fraction of the collective labor, effort, and benevolence that the Defendant stole from the American taxpayer.

**B.      Criminal History, Specific Deterrence, Punishment**

There is no doubt that the Defendant presents with a lack of prior criminal convictions. While the defense touts this unblemished record as a justification to avoid prison entirely, the reality is that having no criminal history is almost a requirement in order to orchestrate this specific brand of fraud.

Federal regulations explicitly mandate that the USDA evaluate a store owner applying to accept SNAP benefits to ensure they demonstrate good character and a reputation for business integrity. *See* 7 C.F.R. § 278.1(b)(3)(i); 7 C.F.R. § 278.1(k)(3)(i). Consequently, the class of individuals authorized to own stores that accept SNAP essentially excludes those with prior criminal convictions. Therefore, the Defendant's lack of criminal record is simply a baseline requirement to gain access to the program.

The Defendant's age is also no reason to further reduce the sentence. He owned the store, employed individuals, personally conducted numerous transactions and oversaw transactions committed by others. He also personally profited from the theft and amassed the assets in a series of bank accounts and certificates of deposit that were seized. *See* ECF#25, pp. 4-5.   The Defendant's age was no barrier to commencing and completing the crimes and it should pose no

barrier to the punishment that he justly deserves.

Moreover, despite arriving in the United States over thirty years ago, the defendant has remarkably little legitimate to show for it. According to the Pre-Sentence Investigation Report, he reports essentially no assets and no income, and possesses no vocational or technical skills. *See* PSR ¶¶115-130. Since 2010, he has operated JVS, which appears to have been his only source of income. His SNAP applications further reveal that his healthcare is subsidized entirely by the federal government (PSR ¶¶32-39). While he did maintain an outwardly modest lifestyle (PSR ¶¶129-130), he was quietly accruing over $400,000 in funds across the various bank accounts and certificates of deposit ultimately seized by the government.

While the parties have agreed to a $1,000,000 forfeiture money judgment, crediting the approximately $400,000 seized from the defendant's bank accounts, there is little to no likelihood that the remaining $600,000 balance will ever be recovered during the Defendant's lifetime. This outstanding $600,000 represents untraced profits that the Defendant withdrew in cash over a short two-year window and the current whereabouts of that cash remains entirely unknown. Crucially, asset forfeiture is merely the disgorgement of ill-gotten gains; it is simply returning property a criminal was never entitled to possess in the first place. While an aspect of sentencing, it is not a replacement for punishment. If the only consequence of being caught in a multi-million-dollar fraud is giving back a fraction of the stolen loot while serving time from the comfort of one's own home, the criminal enterprise remains entirely risk-free. Without a significant custodial sentence, other fraudsters will look at this case and conclude that even the worst-case scenario allows them to break even or do much better – indeed far better than the American taxpayer. Prison is the only currency that fundamentally alters the risk profile of federal benefits fraud, and these circumstances absolutely demand an incarcerated sentence.

Importantly, the sentencing guidelines already value the amount of taxpayer money at a shockingly low rate of only a few months per million dollars stolen.  Beyond this, the government has already factored in a measure of leniency through the Plea Agreement's recommendation of a sentence no greater than the low-end of the guidelines sentencing range. And to further reflect the government's temperance of justice with mercy, the 30-month sentence being recommended is also 10% below the 33 months called for by the guidelines.

The Court must not go any further. Compassion, mercy, and most importantly, justice, call for no less than the 30 months being requested by the government. In this context, the Defendant's age and lack of criminal history have already been fully accounted for in the government's recommendation.  These considerations are simply not sufficient reasons to dilute the sentence any further. The government's 30-month recommendation represents the absolute floor of a just punishment.

### C.    General Deterrence, Promotion of Respect for the Law, and Public Protection

In this case, general deterrence and promotion of respect for the law are incredibly important. Programs like SNAP operate on a structural honor system, intentionally designed with low barriers to entry to ensure that the vulnerable can access aid without bureaucratic impediment. The government cannot place a federal agent at every cash register or audit every convenience store. The Defendant broke this system on both ends: running his store as a clearing house for fraud and personally exploiting the system by lying on his own SNAP application.

This Court must be mindful of the precise message its sentence will broadcast to others who would consider exploiting the charity of the American people and facilitating wholesale theft from government programs in this manner. Crimes, such as these committed by the Defendant, take place because there is a prevailing sentiment among those who commit them that there is little chance of criminal enforcement, and if caught, little likelihood of meaningful incarceration.

This Court must send a clear message to the contrary: *welfare fraud will not be treated as a low-risk, high-reward business venture.*

If the word spreads that a retailer can steal millions of dollars from the taxpayer, illegally exchange alcohol for SNAP benefits, double-dip on personal welfare, amass $400,000 in cash, and ultimately face nothing more than a period of watching television from the comfort of their living room, the deterrent value of the federal judicial system collapses entirely. To deter others, the law must ensure that fraud results in a prison term and not a windfall.

Additionally, promoting respect for the law must remain central to the Court's sentencing consideration. Millions of hardworking taxpayers in this District and across the country labor for long hours, pay their taxes, and struggle to afford their own families' groceries. Those millions of people would never consider committing any crime, let alone a multi-million-dollar federal felony for personal gain over multiple years. The average law-abiding taxpayer earning $30 per hour before taxes, would need to work more than 10 years to earn what the Defendant stole in just a few.

The public trust, particularly among the American taxpayer, simply cannot witness a multi-million-dollar fraudster escape prison for a crime of this magnitude without cynicism or distrust resulting. A meaningful and chastening prison term of multiple years must be imposed to ensure that the foundational values of society are not turned on their head by misplaced sympathy or belated pleas for compassion.

To that end, a sentence of 30 months for this Defendant reflects a full and proper consideration of the sentencing factors. This is not theft from some well-heeled corporation or faceless system. The SNAP program exists to put food on the table for millions of needy Americans. It is not lost on the government that the average American taxpayer, playing strictly

by the rules, would never earn $7 million over the course of multiple lifetimes.[2]  This reality should also not be lost on the Court. The Defendant should be sentenced to 30 months in prison, which is a meaningful fraction of the labor, effort, and public benevolence he chose to steal from the American taxpayer.

## CONCLUSION

Based upon the foregoing, the government requests that the Court impose a sentence of 30 months, followed by three years of supervised release.

Respectfully submitted,

LEAH B. FOLEY,
United States Attorney

By:   */s/ Philip A. Mallard*
PHILIP A. MALLARD
Assistant U.S. Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston MA 02210
617-748-3674

---

[2] The average American spends about 40 to 46 years in the workforce over a lifetime. *See* https://www.gettysburg.edu/news/stories?id=79db7b34-630c-4f49-ad32-4ab9ea48e72b.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Philip A. Mallard
PHILIP A. MALLARD
Assistant U.S. Attorney

Date:   July 4, 2026